**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**BENJAMEN SCOTT BURLEW**
c/o LAW OFFICE OF JONATHAN GROSS
2833 Smith Ave., Suite 331
Baltimore, MD 21209

*Plaintiff*,

v.

**DONALD J. TRUMP**, in his official capacity as President of the United States,
1600 Pennsylvania Ave. NW, Washington, DC 20500;

**TODD BLANCHE**, in his official capacity as [Acting] Attorney General of the United States,
950 Pennsylvania Ave. NW, Washington, DC 20530;

**JEANINE PIRRO**, in her official capacity as United States Attorney for the District of Columbia,
601 D Street NW, Washington, DC 20530;

**UNITED STATES DEPARTMENT OF JUSTICE**, including the United States Marshals Service,
950 Pennsylvania Ave. NW, Washington, DC 20530; and

**DISTRICT OF COLUMBIA**, operating the D.C. Department of Corrections and the D.C. Jail,
Serve: Mayor Muriel E. Bowser, 1350 Pennsylvania Ave. NW, Washington, DC 20004,
and Attorney General Brian L. Schwalb, 400 6th Street NW, Washington, DC 20001,

*Defendants*.

Civil Action No. 1:26-cv-4030

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Benjamen Burlew fought for this country in Iraq and Afghanistan as an Army Ranger. He survived more than 500 firefights. He broke his back falling off a mountain in a firefight in 2007 and kept fighting for two more years. He came home with a Bronze Star with "V" device for valor, a broken body, and severe post-traumatic stress disorder. The Department of Veterans Affairs rates him totally and permanently disabled.

2. In 2024, his own government locked him in a cell in the District of Columbia's Central Detention Facility that was 90 degrees, with two inches of toilet water on the floor, rats running through the water, and water bugs the size of apricots. He was confined there 23 hours a day during the week and 72 hours straight on weekends. He wore the same underwear for nearly four weeks. He was denied medical care, mental health care, and a Bible. He lost about twenty pounds. When he told a lieutenant, she laughed and called it "a great weight loss program."

3. Ten days after he arrived in that cell, he pleaded guilty. He had never had a trial. He had been preparing for one. To this day he maintains that he is innocent.

4. None of this was an accident, and none of it was a surprise to the Department of Justice. By the time Mr. Burlew arrived at the D.C. Jail on May 20, 2024, the Department had been on notice for nearly three years. A United States District Judge had held the Jail's warden and the Director of the D.C. Department of Corrections in contempt in October 2021 and referred the matter to the Attorney General for a civil rights inquiry. The United States Marshals Service had found standing human sewage, water shut off as punishment, food withheld, and staff telling detainees to "stop snitching" to federal inspectors, and had forwarded those findings to the Civil Rights Division. The Chairman and Ranking Member of the Senate Judiciary Committee wrote to Attorney General Merrick Garland about it. The Department did nothing, except keep sending January 6 defendants there.

5. Under Attorney General Garland and United States Attorney Matthew Graves, the Department of Justice used the D.C. Jail the way a police state uses its prisons: as a place to break men until they sign. It held January 6 defendants, people who had come to Washington to protest, in conditions it knew were inhumane, and then offered them a way out. Mr. Burlew took it.

6. When Mr. Burlew's new counsel exposed what had happened and moved to withdraw the plea, the government did not deny a word of his sworn account. It did not investigate. It asked the Jail, and the Jail said everything was fine. The Jail's lawyer was allowed to speak to the Court unsworn, as an attorney, so that no one could cross-examine him. Mr. Burlew was moved out of the D.C. Jail only after a congressional roundtable on September 9, 2024, at which his attorney and his wife testified; after his own Congressman visited him that day; and after another Congressman was turned away at the Jail's door and posted the video to an audience of more than a million people. The Marshals issued the transfer order the next day. Two weeks later, told that the only way to attend his own hearing was to pass back through the CDF, Mr. Burlew gave up his motions rather than return. The government then accused him of obstructing justice for having described his treatment, and asked for 51 months in prison.

7. President Trump freed Mr. Burlew and the other January 6 defendants on January 20, 2025, and the next day the case against Mr. Burlew was dismissed with prejudice. He was never tried and never sentenced. But the Department of Justice has still never acknowledged what was done to him. In 2026, a group of former detainees sued to compel the civil rights investigation Judge Lamberth had ordered in 2021, and still the Department did nothing. Then, on Friday, October 16, 2026, Mr. Burlew's counsel appeared on *The Tucker Carlson Show* and told more than a million viewers about the ongoing weaponization of the Department of Justice, including the treatment of January 6 defendants and the lawsuits demanding accountability. On the very next

business day, Monday, October 19, 2026, the Department opened an investigation of the D.C. Jail reaching back to January 1, 2021, and then told this Court the lawsuit was moot.

8. An investigation does not give Mr. Burlew back the months he spent in the D.C. Jail, the health that was taken from him there, or the trial he never had. Mr. Burlew brings this action to hold the government and the District of Columbia to account for the deliberate violation of his rights under the First, Fifth, Sixth, and Eighth Amendments, and for conspiring to violate them.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(1)–(4) (civil rights), because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1985(3), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which forbids disability discrimination both by recipients of federal funds and in any program or activity conducted by an Executive agency.

10. This Court may grant declaratory relief under 28 U.S.C. §§ 2201–2202. To the extent Mr. Burlew seeks relief other than money damages against the federal Defendants, the United States has waived sovereign immunity under 5 U.S.C. § 702.

11. Venue is proper under 28 U.S.C. § 1391(b) and (e). The federal Defendants are officers of the United States sued in their official capacities who perform their duties in this District, the District of Columbia resides here, and a substantial part of the events and omissions giving rise to these claims occurred here, at the D.C. Jail and in this Court's criminal case *United States v. Burlew*, No. 1:21-cr-647-RDM.

## PARTIES

12. Plaintiff Benjamen Scott Burlew is a disabled combat veteran of the United States Army who lives with his wife, Brandy Bowen, and their children near Tulsa, Oklahoma, on the tribal reservation of the Wyandotte Nation. He was in federal custody from May 13, 2024 until January 2025, and was held at the D.C. Jail from May 20, 2024 until September 11, 2024.

13. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity only, as the head of the Executive Branch that prosecuted and detained Mr. Burlew.

14. Defendant Todd Blanche is the Attorney General of the United States. He heads the Department of Justice, including its Civil Rights Division and the United States Marshals Service, and succeeds to the official position of former Attorney General Merrick B. Garland. He is sued in his official capacity only.

15. Defendant Jeanine Pirro is the United States Attorney for the District of Columbia. She heads the office that prosecuted Mr. Burlew, sought his detention, and opposed his release, and succeeds to the official position of former United States Attorney Matthew M. Graves. She is sued in her official capacity only.

16. Defendant United States Department of Justice ("DOJ" or "the Department") is an Executive agency of the United States. Its components include the United States Attorney's Office for the District of Columbia ("USAO"), the Civil Rights Division, and the United States Marshals Service ("USMS" or "the Marshals"), which held Mr. Burlew in federal custody, chose where he was housed, and transported him. Prosecuting, detaining, housing, and transporting federal defendants are programs and activities the Department conducts.

17. Defendant District of Columbia is a municipal corporation. Through its Department of Corrections ("DOC"), it operates the D.C. Jail. The Department of Corrections is not a separate

suable entity, so the District is named in its place. The District held Mr. Burlew under an arrangement with the Marshals, for which it is paid with federal funds, and its employees acted under color of District law.

18. The D.C. Jail comprises two adjacent facilities: the Central Detention Facility ("CDF") and the Central Treatment Facility ("CTF"). Both facilities are under the direct control of the District of Columbia Department of Corrections. The two facilities are commonly referred to collectively as the D.C. Jail. The D.C. Jail is known to many as the "DC Gulag."

**Other Persons Involved**

19. Matthew M. Graves was the United States Attorney for the District of Columbia from 2021 to January 2025. His office prosecuted Mr. Burlew, and filings opposing Mr. Burlew's requests were made over his name.

20. Jennifer Leigh Blackwell, Anna Z. Krasinski, and Sara E. Levine were the Assistant United States Attorneys who prosecuted Mr. Burlew. Ms. Blackwell and Ms. Krasinski were the government's lead counsel throughout 2024 and received counsel's repeated written requests described below.

21. Andrew Mazzuchelli is the Deputy General Counsel of the D.C. Department of Corrections. He was copied on, or wrote, the emails described below, and spoke for the Jail at the August 15, 2024 hearing.

## STATEMENT OF FACTS

**Ben Burlew, Army Ranger**

22. Mr. Burlew joined the Army as a teenager. After the attacks of September 11, 2001, he deployed to Iraq and Afghanistan as an Army Ranger and served as a combat soldier until 2009. He was engaged in more than 500 firefights. He lost more friends in combat than he can count.

23. In 2007, during a firefight, Mr. Burlew fell off a mountain. He broke his back and suffered other severe injuries. By the grace of God, he was not killed. Because he could still walk, the Army gave him pain pills and kept him in combat. He kept fighting for his Country for two more years. His back fused incorrectly and never healed properly.

24. Mr. Burlew was sent home in 2009 and honorably discharged. His decorations include the Bronze Star Medal with "V" device for valor; the Army Commendation Medal with two bronze oak leaf clusters; the Army Achievement Medal with one bronze oak leaf cluster; the Good Conduct Medal (2nd award); the National Defense Service Medal; the Overseas Service Ribbon; the Combat Infantryman Badge (1st award); the Expert Infantryman Badge; the Marksman Badge with Grenade Bar and Rifle Bar; the Parachutist Badge; the Ranger Tab; and the Global War on Terrorism Service Medal.

25. Mr. Burlew lives with the physical and emotional scars of his courageous service every day. He has severe PTSD, a traumatic brain injury, chronic back pain from the fracture, cervical radiculopathy and sciatica, a shattered left ankle, rheumatoid arthritis, sleep apnea, severe depressive disorder, and hearing loss that requires hearing aids. He once contracted malaria, and his body has difficulty adjusting to heat. After years of adversarial proceedings, the Department of Veterans Affairs and the Social Security Administration both found him fully disabled. The VA is his primary health care provider and the custodian of his medical records.

26. Because of his disabilities, Mr. Burlew rarely travels more than 45 minutes from home by car, and when he does he must stop often to stretch. He has flown only once or twice since his discharge, and only with heavy pain medication. At times his PTSD causes him to withdraw from the world for days.

27. Like many veterans, Mr. Burlew struggled with drug addiction after he came home. With God's help he recovered, and he has spent years building a routine of sobriety around his family, his church, and his community. He takes comfort in reading the Bible. To stay away from addictive drugs, he manages his pain and PTSD with medical cannabis prescribed for him, chiropractic care, hot and cold baths, a TENS unit, and specialized shoes; before his arrest, two of his dogs were being trained as service animals to wake him when his breathing stops in his sleep. Before the events described here, he had never been in trouble with the law in his life.

**January 6, the Arrest, and Two Years of Compliance**

28. On January 6, 2021, Mr. Burlew was in Washington, D.C., to take part in the protest of the certification of the 2020 presidential election. Peaceable assembly and petitioning the government for redress are activities the First Amendment protects.

29. Mr. Burlew never entered the Capitol building. He was on the Lower West Terrace in the early afternoon, minutes after Metropolitan Police officers arrived, and he left the area at about 1:35 p.m., before the police line broke, before anyone entered the building, and before the crowd surged after 2:02 p.m., following the incident when a Capitol Police officer shoved a peaceful protester off a 30-foot wall. While he was on Capitol grounds, both Houses of Congress continued their business. The government later alleged that he grabbed a police officer in an encounter lasting seconds. Mr. Burlew denies that he committed any crime, and, for the reasons set forth below, was never provided an opportunity to defend himself at trial against the allegations.

30. The government arrested Mr. Burlew on August 19, 2021. He was one of roughly 1,600 American citizens targeted by the weaponized Biden Department of Justice. President Trump has described the January 6 prosecutions as a "grave national injustice."

31. The arresting officers grabbed Mr. Burlew and tried to handcuff him behind his back. Because of his broken back and other injuries, that position causes him excruciating pain. He tried to explain this, but the officers would not listen.

32. As they forced his hands behind his back, Mr. Burlew involuntarily struggled for a few moments. No one was hurt, and he did not strike anyone. He instinctively called out his name and Social Security number, as soldiers are trained to do when detained, to signal that he would submit. He shouted more than fifteen times, "Cuff me in the front!" and begged the officers to let him do so.

33. Eventually one officer, himself an Army veteran, saw how much pain Mr. Burlew was in, uncuffed him, and cuffed him in front. Mr. Burlew never intended to resist arrest, and it would have been objectively obvious to anyone watching that he was trying only to be spared needless pain. On information and belief, the officers' body-camera footage confirms this.

34. On August 26, 2021, Mr. Burlew appeared by video before a Magistrate Judge of this Court. The government told the court that he had resisted arrest. The judge did not believe it; she could see that he was in pain, as the transcript reflects. She released him on personal recognizance. The government has continued to repeat the claim that he resisted arrest.

35. A grand jury indicted Mr. Burlew on October 27, 2021. For the next two years, every proceeding actually held in his case took place by video: his arraignment on November 5, 2021; his arraignment on a superseding indictment on March 25, 2022; a status conference on September 8, 2022; and a competency hearing on December 19, 2022. Remote appearance was how this case was conducted. The Court did not require him to fly to Washington for every proceeding.

36. For more than two years, Mr. Burlew complied with every condition of release. His pretrial services officer, Aaron Tyler, never raised the slightest problem.

37. Mr. Burlew's financial circumstances qualified him for a court-appointed attorney, and one was appointed to represent him. Mr. Burlew had never needed a criminal lawyer and did not know what to expect. Mr. Burlew was not provided his discovery. His court-appointed attorney met with Mr. Burlew twice by Zoom, for about thirty minutes each, and showed him only open-source video that Mr. Burlew could have found online. He showed him no body-camera footage.

38. Mr. Burlew pointed out people in the videos whom he wanted as witnesses, but he was told that the defense could not seek more discovery, and that he was only allowed to use evidence the government provided.

39. In September 2022, his court-appointed attorney asked the court to order a competency evaluation. A court-appointed psychologist met Mr. Burlew once for an hour, on November 4, 2022. The competency motion was treated as withdrawn in December 2022, and trial was set for December 2023. Mr. Burlew then asked his court-appointed attorney to present his PTSD in his defense at trial. But his court-appointed attorney adamantly refused.

40. From March until September or October 2023, Mr. Burlew did not see or speak with his court-appointed attorney, and they never had another substantive conversation about the defense. He was not prepared for trial.

**The DC Gulag, and What the Department of Justice Knew**

41. After January 6, 2021, the Department of Justice adopted a practice of seeking pretrial detention of January 6 defendants and transporting them from their home states to Washington, D.C., to be held at the D.C. Jail. Many had been released by magistrate judges at

home. The DOJ appealed, often arguing that the defendants were a danger not to any person but to "democracy" itself.

42. Most of these detainees had no criminal record. Under ordinary classification criteria they belonged in the lowest-risk custody levels. Records obtained from the D.C. Jail show that January 6 detainees had their internal classification scores raised because of nothing more than their status as January 6 defendants. They were housed in a segregated unit reserved for them, commonly called the "J6 pod."

43. By mid-2021, January 6 detainees and their families were reporting extended lockdowns, prolonged solitary confinement, denial of medical care, denial of religious services, and interference with access to counsel. When Representatives Marjorie Taylor Greene, Louie Gohmert, Matt Gaetz, and Paul Gosar tried to inspect the Jail on July 29, 2021, they were turned away. They were turned away again on November 3, 2021.

44. On October 13, 2021, in *United States v. Worrell*, Judge Royce C. Lamberth held the Warden of the D.C. Jail, Wanda Patten, and the Director of the D.C. Department of Corrections, Quincy Booth, in civil contempt of court, after the Jail denied Christopher Worrell, a January 6 detainee with non-Hodgkin's lymphoma, needed medical care. Judge Lamberth ordered the Clerk to send the order to the Attorney General "for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case." The hearing was held in open court. An Assistant United States Attorney appeared for the United States. The Director of the Department of Corrections, its Deputy Director, its General Counsel, and its Assistant General Counsel sat in the courtroom. Judge Lamberth recounted that weeks earlier he had personally called the Acting United States Marshal, told him that if the Jail would not provide proper treatment he wanted the detainee moved, and said that "other prisoners might need to be moved

from the D.C. Jail." He found that the Department of Corrections had "given the back of the hand to the Court," and ruled from the bench that "it's more than just inept and bureaucratic shuffling of papers. I find that the civil rights of the Defendant have been abridged. I don't know if it's because he's a January 6th Defendant or not. But I find that this matter should be referred to the Attorney General of the United States. I will do so by order for a civil rights investigation of whether the D.C. Department of Corrections is violating the civil rights of January 6th Defendants by engaging in the conduct in this and maybe other cases as well. It's clear to me that the rights of this Defendant were violated by the D.C. Department of Corrections in this case. And it is apparent that there is more going on here than just laying aside these papers." From that day on, the prosecutors, the Marshals, the Jail, and this Court were all on notice.

45. Beginning October 18, 2021, the Acting United States Marshal for the District of Columbia sent eight deputies on an unannounced inspection. Over four days they interviewed more than 300 detainees. In a memorandum dated November 1, 2021, addressed to Director Booth and copied to the Chief Judge of this Court and the Deputy Chief of the DOJ Civil Rights Division, the Acting Marshal reported "evidence of systemic failures, in particular at the Central Detention Facility (CDF)." The inspectors found:

- water and food that appeared to be withheld from detainees for punitive reasons;
- large amounts of standing human sewage in the toilets of occupied cells, and an overpowering smell of urine and feces;
- water shut off to cells for days, so that detainees could not drink, wash, or flush, which staff confirmed was routinely done as punishment;
- hot meals served cold and congealed, and food storage below industry standards;
- pervasive drug use and the smell of marijuana smoke throughout the facility;
- detainees with visible injuries and no corresponding medical or incident reports;
- staff antagonizing detainees, and staff telling detainees not to cooperate with the federal inspectors, including one telling a detainee to "stop snitching"; and
- supervisors who appeared unaware of, or uninterested in, any of it.

46. The Acting Marshal expressly forwarded these findings to the Civil Rights Division for review of potential violations of the Civil Rights of Institutionalized Persons Act. As of November 1, 2021, the Department of Justice had official, written notice from its own law enforcement agency that the CDF was violating the civil rights of the people held there. The Marshals then removed most of the roughly 400 federal detainees held at the CDF, many of them District residents, and sent them to different facilities, some of them no better than the D.C. Jail.

47. On November 4, 2021, Representatives Greene and Gohmert were finally allowed a limited tour. Representative Greene's report, *Unusually Cruel: An Eyewitness Report from Inside the D.C. Jail*, described cells with residue of human waste, blood, and mold; black mold in showers; detainees denied access to counsel, family, adequate food, and religious services; retaliation against detainees who complained; and a detainee held in solitary confinement for 200 consecutive days.

48. On November 10, 2021, the D.C. Council's Committee on the Judiciary and Public Safety held a public oversight roundtable titled "Conditions of Confinement at the D.C. Jail," to examine the Marshals' findings and their decision to transfer hundreds of detainees out of the CDF. Its chair, Councilmember Charles Allen, called the situation "a crisis." Witnesses, including former employees and inmates, described staff misconduct, medical neglect, and unsanitary conditions, and testified that the problems had persisted for years.

49. In December 2021, in *United States v. Nichols*, Judge Thomas F. Hogan found on an undisputed record that January 6 detainees were being confined to their cells 22 to 23 hours a day, and accepted the argument that the defendant's due process rights had been violated as another basis for his release.

50. On February 24, 2022, the United States Attorney's Office for the District of Columbia, then led by Matthew M. Graves, announced the arrest of a D.C. Department of Corrections officer assigned to the CDF for taking bribes to smuggle knives, drugs, and cell phones to inmates. The office that prosecuted Mr. Burlew thus confirmed, in its own words, criminal corruption inside the facility where it was sending January 6 defendants.

51. On May 6, 2022, the Chair and Ranking Member of the Senate Judiciary Committee, Senators Richard J. Durbin and Charles E. Grassley, joined by Senator Benjamin L. Cardin, wrote to Attorney General Garland about the Marshals' findings. They wrote that "no person should be held under the unconscionable conditions that USMS found at CDF," and that it had taken complaints by January 6 detainees to address conditions that had long been a matter of public record. They noted that one detainee had reportedly been pepper-sprayed and then denied a shower for days; that Jail staff had obstructed the Marshals' access and told detainees not to cooperate; and that a 2015 report by the Washington Lawyers' Committee for Civil Rights and Urban Affairs had already documented vermin, mold, and decaying plumbing at the CDF. They warned that those who deprive detained persons of their civil rights "may be subject to criminal charges under 18 U.S.C. § 242," urged the Department "to immediately investigate potential civil and criminal violations of federal law at CDF," and asked for the status of the Civil Rights Division referral by May 27, 2022. Attorney General Garland had personal, written notice. On information and belief, no investigation followed.

52. On February 14, 2024, the House Subcommittee on Crime and Federal Government Surveillance questioned the Director of the U.S. Marshals Service about the treatment of detainees at the D.C. Jail. Representative Troy Nehls stated at the hearing that both the Marshals and the

D.C. Department of Corrections had refused his requests for body-camera footage of an incident involving a January 6 detainee.

53. On June 7, 2024, while Mr. Burlew was held in the CDF, the District Task Force on Jails and Justice issued a statement disapproving the District's proposed plan for the Jail. It reported that seventeen people had died in the custody of the D.C. Jail over approximately the preceding seventeen months, roughly one death a month, and that no satisfactory plan existed to cure the failures the Marshals had found in 2021. Three people died in the Jail within about two weeks in May 2024, around the time Mr. Burlew arrived. Another died in mid-September 2024, the sixth in-custody death of the year, and the Department of Corrections reported three inmate-on-inmate assaults in the CDF between September 11 and 14.

54. Despite all of this, the Department of Justice under President Biden, Attorney General Garland, and United States Attorney Graves never opened the civil rights inquiry Judge Lamberth ordered. It never acted on the Marshals' referral. It did not stop sending January 6 defendants to the D.C. Jail. It kept doing so until January 2025.

55. The Department kept using the D.C. Jail not in spite of its conditions, but because of them. Detention there was a powerful tool to pressure January 6 defendants, who had no criminal records and would otherwise have awaited trial at home, into pleading guilty rather than exercising their right to a trial. The Department knew that conditions at the Jail violated detainees' rights, and it chose to use that fact.

**A Hearing That Could Have Been Held by Video, and the Road to the DC Gulag**

56. In November 2023, a plea hearing was set for November 30, 2023. On November 28, about 41 hours before the hearing, Mr. Burlew’s court-appointed attorney told the court that Mr. Burlew would not go forward with a plea. Mr. Burlew had decided to exercise his right to a

trial. The court converted the November 30 hearing into a pretrial conference, set it "In Person," and set trial for December 11, 2023.

57. Mr. Burlew asked his court-appointed attorney to request that he be allowed to appear remotely, as he had at every proceeding held in his case. His attorney came back with the answer: no. He told Mr. Burlew that the court no longer allowed Zoom and that there was no alternative to appearing in person. That was not true. This Court continued to allow January 6 defendants to appear remotely at pretrial conferences. For instance, Cindy Young, a January 6 defendant from New Hampshire, appeared by Zoom at her pretrial conference in this Court on August 1, 2024.

58. Mr. Burlew told his court-appointed attorney that getting to Washington would be extremely hard. The family lives mostly on his disability benefits. He does not fly, and could not do so without heavy pain medication, which as a recovering addict he avoids. He rarely drives more than 45 minutes from home. His wife could not leave their children, and they had no one to drive him and no money to hire a driver. His attorney offered no help or advice except that Mr. Burlew had to get there. No motion was filed requesting a remote appearance.

59. Mr. Burlew's disabilities were no secret. The government had his military and VA records in its own discovery, and the court-ordered evaluation had put his PTSD before the court and the prosecutors. Yet no one offered him the simple accommodation he needed: permission to appear by video, as he always had. The government's position was the same in January 2025, when it opposed his request to appear remotely at sentencing and offered no alternative.

60. So Mr. Burlew set out to drive himself the roughly seventeen hours to Washington, leaving with plenty of time. On the way, he suffered a mental health emergency. The anxiety of a trial he did not feel ready for, with a lawyer he did not believe was ready, together with the strain

of the long drive alone, triggered his PTSD in a way he had not experienced since 2019. He stopped the car and blacked out. For several days his wife did not know where he was.

61. After several days, Mr. Burlew made his way home. He suffered a breakdown from which he did not recover for months. Neither he nor his wife received any call from his court-appointed attorney, nor did his court-appointed attorney tell Mr. Burlew what happened in court, what the consequences were, or what to do next. The only thing his office sent was a generic holiday greeting card. To this day Mr. Burlew does not know what was said in court about him.

62. On November 30, 2023, the court noted that Mr. Burlew was not present and reset the conference for December 8. On December 1, a warrant issued, but the docket entry was restricted to "authorized users" and could not be seen by the public. On December 8, the court vacated the trial, tolled the speedy-trial clock until Mr. Burlew's next appearance, and listed his bond status as "Continued PR," meaning continued release on personal recognizance. Mr. Burlew and his wife checked the docket every day and saw nothing telling him to do anything. For more than five months, no one from the government, the court, or pretrial services contacted them. Had anyone told him what to do, he would have done it.

63. On May 8, 2024, the FBI contacted Mr. Burlew's wife. The family was told he could appear voluntarily at a hearing in federal court in Tulsa on May 13, 2024. He agreed immediately and without hesitation. On May 13, 2024, he appeared exactly as promised, and the warrant was "executed" on the man who had walked in on his own.

64. The government asked that Mr. Burlew be detained as a danger to the community and a flight risk. The court rejected the claim of danger. It ordered him detained on the sole ground that the government had shown by a preponderance of the evidence that no condition would

reasonably assure his appearance. The judge remarked on the record that Mr. Burlew looked as though he was in pain.

65. Mr. Burlew was taken into custody in front of his wife and his eight-year-old son. He was not allowed to say goodbye to his son. It has affected the boy deeply, and Mr. Burlew still cannot understand why he was not allowed that one moment.

66. From the courthouse he was taken to a local jail in Oklahoma, and a few days later to a second Oklahoma jail. When he arrived at the second jail, he told staff at once that he was disabled. They told him that "the Board of Prisons will decide." No one ever asked about his disabilities, and no one accommodated them. Although he was plainly in unbearable pain, he received no medical attention.

67. The moves were disorienting and traumatizing. He did not know where he was, what day or time it was, what his family knew, or whether he would ever go home. His family was not told where he was.

68. The Marshals then drove Mr. Burlew from Oklahoma toward Washington in a van, chained and shackled, for hours at a time without stopping to let him stretch or use the bathroom. For a man with a fused, fractured spine and rheumatoid arthritis, who had not ridden in a car for more than 45 minutes in years, the trip was excruciating. No accommodation of any kind was made.

69. In Virginia, another prisoner in the van had a heart attack. Mr. Burlew watched the man, bound in chains, convulse, clutch his chest, and gasp, "I'm having a heart attack!" Every instinct he had as a soldier told him to help, but he was chained and helpless himself. He thought he was going to die there, and that his wife and children would never see him again or even learn

how he died. After more than a decade in combat, he describes it as one of the most frightening moments of his life.

70. Because of the emergency, the van stopped for the night at a sheriff's station in Virginia, where Mr. Burlew was held in a cell. He did not sleep for a second.

71. In Washington, Mr. Burlew was booked into the CDF on May 20, 2024, the same facility the Marshals had found violating detainees' civil rights nearly three years earlier, in October 2021. He was taken to the courthouse and left alone all day in a holding cell, with nowhere to sit but a hard bench against a cinderblock wall, in great pain, only to be told there would be no hearing that day. On May 22, 2024, he was brought back to the courthouse and presented before Magistrate Judge Zia M. Faruqui. His court-appointed attorney conceded to his detention. Mr. Burlew was sent back to the CDF.

**Inside the CDF, and the Plea**

72. Mr. Burlew lived for years in mud huts and shipping containers in Iraq and Afghanistan, and he guarded enemy combatants in captivity. He says without exaggeration that the conditions in the CDF were worse than anything he saw or experienced in war.

73. He was placed in a tiny cell with nothing but a cot and a toilet. The toilet leaked, and about two inches of toilet water covered the floor. He tried to mop it with his blanket, which did little and left him with no blanket. Rats ran across the floor through the toilet water. Water bugs the size of large apricots crawled through the cell. The stench was constant.

74. The cell was about 90 degrees. There was no air conditioning, and he had to strip to his underwear. He was given no change of clothing. He wore the same underwear from May 13 until June 8, 2024, when he finally received clothing after his wife complained.

75. For his first 72 hours, from about May 21 to May 23, he was locked in that cell without a break. He was given no commissary, no medication, no medical attention, and no mental health care. No one assessed his disabilities or his health, and no accommodation was made for any of them.

76. Mr. Burlew's conditions of release had expressly allowed him to use the medication prescribed for his chronic pain. The Jail would not provide it. The only pain treatment it offered was opioids, to a man in recovery from addiction. When he refused, the Jail's lawyer later said, he was "not sure what other pain options there were." So there were none. Not until August 20, 2024, three months after he arrived, and only at his own request, was he prescribed a non-steroidal anti-inflammatory.

77. After that first lockdown, during the week he was confined to the cell 23 hours a day, with one hour to shower and/or call his wife and children. On weekends he was locked down for 72 hours straight, confined to his cot in his underwear, sweating, unable to move, in excruciating pain, surrounded by toilet water, rats, bugs, and the smell. He did not even have a Bible. He had nothing but the thoughts in his head.

78. When guards turned on the cell lights, the cell grew hotter, and it felt to him as though they were cooking him. During the weekend lockdowns, guards sometimes left the lights on for hours at a time. With the lights off it was cooler, but too dark to see anything unless he lay on the floor by the light through the tray slot.

79. The only ventilation was a single fan. Other prisoners periodically unplugged it to use the outlet to smoke drugs, which Mr. Burlew was told was fentanyl. He had to choose between leaving the tray slot open for air and covering it to keep out the drug smoke. For a recovering addict, the exposure was its own danger.

80. Mr. Burlew repeatedly asked for mental health care. Guards told him to "quit crying." Even after a supervisor told him he could receive mental health care, he received none during his entire time in the CDF.

81. In the CDF, guards did not provide grievance forms, so no grievance process was available. Even where it existed, it took weeks or months, offering detainees no meaningful recourse.

82. Two days after he arrived, on a recorded jail call on May 22, 2024, Mr. Burlew told his wife that he had had "a PTSD break," that he wanted to "get the plea done," and that he wanted "to be done." The government would later use this call against him. It shows exactly what the CDF was doing to him: within 48 hours, a man who had chosen trial six months earlier was begging to be done.

83. On May 23, 2024, after Mr. Burlew had spent 72 hours in that cell, his court-appointed attorney visited him. He told Mr. Burlew that the judge was "pissed" at him and that there was no way the judge would grant him bail. He told Mr. Burlew that he had no choice but to concede to detention, and refused to make any argument for his release. He told him trial would not happen for at least another year, which Mr. Burlew understood to mean at least another year in jail. He made clear that the only way out was to sign a plea agreement.

84. The plea agreement had been offered by the United States Attorney's Office, with a bare-bones statement of offense. On information and belief, the prosecutors knew when they extended and pressed the offer that Mr. Burlew was being held in the CDF, the same facility the Marshals had found in systemic violation of detainees' civil rights, and they intended that his conditions there would induce him to plead.

85. Mr. Burlew felt he had no choice. He told his court-appointed attorney he would give up his right to trial if it would get him out of jail and back to his wife and children, but only if his wife reviewed and approved the agreement first. His attorney told him he had sent it to her and that she had approved it. That was false. He signed the agreement on May 28, 2024. His wife did not receive it until after he had signed.

86. A bond revocation hearing had been set for May 30, 2024. Instead, the bond hearing became a plea hearing; the docket records that the bond hearing "was not held" and that Mr. Burlew "does not contest detention." His court-appointed attorney warned Mr. Burlew not to mention his conditions of confinement, because it would only further enrage a judge who was already "pissed" at him. His attorney knew about the conditions and did not raise them himself. He led Mr. Burlew to believe that if he kept quiet, he would be moved out of the CDF to the CTF, which he was told was far better. Mr. Burlew asked his attorney at least to ask for a Bible, which he had been without for more than two weeks.

87. At the hearing, Mr. Burlew answered yes to every question the judge asked. All he could think about was getting home to his wife and children, or at least getting out of the CDF. He could not concentrate on anything. Whenever he was let out of the cell, for a phone call or for court, all he could think about was how good it was to breathe air. He was not in his right mind.

88. Mr. Burlew would not have pleaded guilty but for his conditions in the CDF and everything that had been done to him since May 13. His plea was coerced. He had chosen to go to trial, and signed only after days in the CDF under the conditions described above.

89. From May 13 to May 30, Mr. Burlew suffered unbearable physical and mental trauma. He was deprived of basic nutrition. His fingernails became so brittle he could peel them away, and one of his toenails fell off. He felt his body was falling apart. During the transfers and

his time in the CDF he lost about twenty pounds. When he mentioned it to a female lieutenant, she laughed and said, "It's a great weight loss program." He felt humiliated, and terrified to be guarded by people with no human empathy.

90. Pleading guilty did not get him out of the CDF. He was sent back there for another eleven days, still without a change of clothes until June 8 and still without a Bible, even after this Court expressly ordered that he be given one. The prosecutors later explained that the Jail said Mr. Burlew "had not gone through the proper procedure to request one." He had asked for one again and again. By the government's own account, he had a Bible only after he left the CDF.

91. He was moved to a cell across the hall, from which he could see the cell with the leaking toilet. One day a maintenance worker came, looked at that toilet for less than a minute, opened a locked box behind the cell, turned a valve, and fixed it. Mr. Burlew and another prisoner watched with their mouths open, then laughed uncontrollably. The Jail could have fixed the problem at any time in a minute. It had simply let it go on, day after day, while he lived in it. Even the Jail's own records, as the government later relayed them, admit the leaking toilet. They claim a work order was not opened until June 7, 2024, eighteen days after Mr. Burlew was placed in that cell, and that he was moved out that day. Either the Jail left a flooded cell unrecorded for nearly three weeks, or its records are not true.

92. The new cell still had rats and giant bugs, and it was still about 90 degrees. Because he once had malaria, his body struggles to regulate heat. He scared off the rats, sat on the floor under the sink, and drenched his head in the sink about every hour, for days, to keep his temperature down. That was a luxury he had not had in the first cell. His arthritis was so bad that he barely slept the entire time he was in the CDF.

93. On or about June 8, 2024, Mr. Burlew's wife emailed the Department of Corrections and the Mayor's office. She wrote that he had been held for 17 days in "involuntary protective custody"; that because of that status he had been told he would not be assigned a caseworker for his health and housing paperwork, and had been denied commissary; that he was not permitted laundry and was washing his clothes in the shower; that his bedding had not been changed in 17 days; that he had been locked down 23 hours a day and 72 hours on weekends; that he had been denied a Bible even after the judge ordered one; and that his cell was over 85 degrees, with no air flow except drug smoke, for a man whose body could not regulate heat after malaria and whose lungs were damaged by burn pits in combat. She invoked his rights under the Americans with Disabilities Act. She also complained to the Warden and the Director of the Department. On the evening of June 10, 2024, Mr. Burlew was moved to the CTF. The next day, the Department's Deputy Director of Administration, Michelle Wilson, copying the Mayor's office, replied that he had been transferred and that she was "currently investigating the concerns you've expressed." Ms. Wilson had sat in Judge Lamberth's courtroom in October 2021, as the Department's Assistant General Counsel, when he held the Jail's leaders in contempt and referred the Jail to the Attorney General. At the CTF, Mr. Burlew was placed in the pod reserved for January 6 defendants, segregated, he was told, for their own safety from other prisoners. The CTF was better than the CDF, but not by much.

94. He was first housed on the second floor. With his spine and arthritis he could not get dressed and down the stairs fast enough when guards called recreation without warning, and he was shut out. Another detainee helped him get water and other necessities because his mobility was so limited. Only later was he moved to a ground-floor cell.

95. In July 2024, detainees in the J6 pod were told the Jail would end their involuntary protective custody, opening the unit to other prisoners. They were frightened. On July 25, the Jail's lawyer responded to counsel's urgent request with a citation: housing decisions were "in the sole discretion of DOC; not the Court's, prosecution's, or defense counsel's." Detainees asked to see a lieutenant, who told them the change would not take effect. That same week, they received no dinner tray until 9 p.m.

96. From May 20 to June 10 in the CDF, Mr. Burlew was never allowed outside. At the CTF he was first allowed outside for one hour on July 2, 2024, and not again until July 24. In more than sixty days, he saw the sky for about two hours.

97. The Jail kept no routine. Meals, medication, showers, and outdoor recreation came at random times, different every day. A detainee who missed recreation by a second lost it. The disorder was harmful to Mr. Burlew's mental health; like most people, and especially as someone with PTSD, he depends on predictability. At the CTF his cell was exposed to loud construction noise. To a combat veteran with PTSD it sounded like explosions, and when he heard it he reflexively dropped to the floor in fear for his life.

98. At the CTF, Mr. Burlew filed many grievances, to no avail. He was handed ADA accommodation forms, but his disability left him unable to complete them, and when he asked for help, he was told the person responsible was on vacation until late August. He remained in constant physical and psychological anguish.

99. Other detainees who witnessed his treatment, including J6er Joshua Atwood, who saw the CDF cell where Mr. Burlew was held when he signed the plea, have come forward to confirm his account, and would tell the same story with the same details.

**The Grievance Game**

100. Mr. Burlew arrived at the D.C. Jail on May 20, 2024. He was not able to obtain a single grievance form until July 4, 2024, forty-five days later, after he had been moved to the CTF. Even then, the only forms he could get were in Spanish. The forms he filled out on July 4 were not stamped as received until July 8. Forms he filled out on July 8 were not stamped as received until July 18.

101. The Jail's own forms set the rules. A detainee has "five (5) days after [the] triggering incident to submit [a] request," and must "[p]lace this form in the housing unit IGP box." A grievance not submitted within five days "will not be reviewed." Each grievance may address "only one (1) issue." And a detainee who files "more than five (5) grievances in a week or 20 or more grievances in any 180 consecutive days" may be found to be "abusing the grievance procedure," and his grievances "will not be considered until all pending grievances have been resolved." A detainee locked in his cell 23 hours a day cannot walk to the box. A detainee who has no form, or no pen, cannot meet a five-day deadline. And a disabled veteran with dozens of untreated conditions, who must file one grievance per issue, will be branded an abuser of the process within a week.

102. On July 4, 2024, Mr. Burlew filed two grievances on the Spanish forms. In the first he wrote: "I am 100% P and T disabled through the VA and a federal judge. We have been trying to get my records to the physician. My wife and attorney have been getting the run around. According to the ADA / Civil Rights Act, my medical records need to be looked at by the physician ASAP. My health is deteriorating. Have seen no one in 6 weeks in your custody." On July 16, the Jail answered that the "medical records that are requested would require the document inmate request form submitted directly to medical records." In the second he wrote: "I have a number of times asked to see mental health along with a medical screening. . . . So for 6 weeks my health has

deteriorated. Without concern but with prejudice. By law / ADA / Civil Rights Act you are in gross violation." The Jail answered that he had been "[s]een for mental health on 7/12/2024, provided with schedule as needed for appointments."

103. On July 8, 2024, Mr. Burlew wrote two more, one to the officer on duty and one to his case manager. In the first he wrote: "I have 52 physical ailments going on in your custody. And not one has been addressed. They say they need my med records. The attorney for the DOC general counsel has them. . . . Was healthy when I arrived here. I have no accommodations made. None. Zero. Have seen no one. I do not take pharmaceuticals. . . . I am in serious physical decline." In the second he wrote: "My mental health was good till DOC took charge of my care. I have expressed for 8 weeks needing care. And nothing, no accommodations. . . . The general counsel has my med records and still have not seen anyone. . . . My mental health is declining. 26 issues now since your care. None prior with the treatment I was on."

104. The Jail took more than two weeks to answer. On July 23, it wrote that he had been "[s]een for sick call 7/10/24 for multiple medical concerns," given a "[r]eferral for physical therapy and neuropathic pain medication," and that he "declined." The medication was a pharmaceutical, offered to a man in recovery who had just written that he does not take pharmaceuticals. On July 24, it wrote that he had been "[s]een for mental health appointment 7/12/24," "advised to refrain from foods and other things that would affect his sleeping patterns," encouraged to try "stress-free exercise," and given melatonin. That was the Jail's response to a combat veteran with PTSD who had spent weeks in inhumane conditions and solitary confinement.

105. Also on July 8, Mr. Burlew wrote: "I am 100% P+T TDIU. VA/SSDI. I have multiple mental health issues not being addressed and physical ailments also. I was on a[n] all natural regimen for 4 years. My health when started was horrible, could barely walk. Before you

took me into custody I was in good health, mentally & physically. Since then my mental health & physical health has declined drastically due to no treatment / no accommodations . . . . This is a violation of law / Civil Rights Act, Americans with Disabilities Act. The General Counsel has my med records. I need treatment & natural med. Cold water treatments, etc." The Jail did not stamp it received until July 18. The same day, it wrote "Denied – See attached." The attachment, a pre-printed "Denial of IGP Form," gave one reason, by checkmark: the issue was "addressed in" another grievance.

106. On July 10, 2024, Mr. Burlew wrote: "Title II of the ADA, 42 USC §§ 12131-12134 – Under these laws, correctional facilities cannot discriminate against a prisoner on the basis of a disability. And they must take reasonable measures to provide equal access to programs, services and benefits to prisoners with disabilities. Under the Constitution the Eighth Amendment prohibits cruel or unusual punishments, while the Fifth and Fourteenth Amendments provide due process & equal protection right. I am being denied my form of medication & treatment while detained in this facility. You by law do not have that right. Natural & holistic medicine & treatment is what I was on for 4 years. Why continue to house me when you cannot treat me. Need remedy soon, health deteriorating." On July 18, the Jail wrote "Denied – See attached," with the same checkmark.

107. On July 12, 2024, Mr. Burlew reported a threat to his safety. Another detainee "has tried to fight me and others," he wrote. "I am disabled 100% and cannot afford physical altercation due to combat injuries. Cannot be sprayed due to lung issues from burn pits. Would possibly stop breathing." He could not submit it until the next day. On July 23, the Jail wrote only that "this inmate is no longer in the unit." The grievance coordinator did not sign off until July 29.

108. On none of these grievances did the Jail check either box on its own form, "Resolved" or "Not Resolved – Inmate Advised of formal process." None acknowledged that Mr.

Burlew was disabled. None provided an accommodation. None told him how to take the next step. Two were denied outright without a word about their substance.

109. The government nonetheless told the Court that Mr. Burlew "has only filed three grievances, which the jail has addressed." The grievances the government itself produced show at least seven in the first ten days he had forms, and show what "addressed" meant.

110. This is how the D.C. Jail, like many jails and prisons, protects itself. Under the Prison Litigation Reform Act, a prisoner may not sue over his conditions until he has exhausted the facility's administrative remedies. Facilities know this, and they control those remedies. They withhold the forms. They wait days or weeks to collect them. Detainees at the Jail have been handed forms with nothing to write with. Grievances sit unanswered for weeks or months; when answered, they are denied summarily, without reasons; and each denial leads to another level of appeal that takes weeks or months more. For a pretrial detainee, who can be moved or released at any time, the process can outlast the detention itself, and a transfer moots every grievance pending. Courts, meanwhile, presume that jail officials act in good faith. Complaints against Jail staff went unaddressed for months.

111. The result is that a jail can deprive a disabled detainee of his medication, his treatment, and his dignity with near-total impunity, unless he dies. Mr. Burlew's grievances were still pending, or had been summarily denied, when the Marshals moved him to Philadelphia in September. No remedy was ever available to him. Mr. Burlew is no longer a prisoner and is not subject to the exhaustion requirement in this action; but the Jail's handling of his grievances is itself part of the deliberate indifference alleged here.

**"Our Position Has Not Changed": The Government Would Not Deny It, and Would Not Look**

112. On July 3, 2024, his court-appointed attorney withdrew, and undersigned counsel entered an appearance. On July 15, 2024, counsel spoke by phone with AUSAs Blackwell and Krasinski. They told him the only problem they were aware of at the CDF was that Mr. Burlew had not been given a Bible. They told him the government insisted on detention because Mr. Burlew was a danger to the community and a flight risk. When counsel asked when he had ever been found a danger, they acknowledged that he had not.

113. The same day, counsel sent the prosecutors Mrs. Burlew's June 8 email to the Jail, describing 23-hour lockdowns and the absence of any case manager for his medical conditions, and asked them to look into his treatment. On July 16, AUSA Krasinski replied that, "based on the information we have to date, we don't agree to release," and that the government would oppose any motion to vacate the plea. When counsel asked what had happened between the docket entries, she told him to "feel free to order transcripts." Ms. Krasinski knows full well that transcripts can cost hundreds, sometimes thousands of dollars to purchase, even today when AI should make all court transcripts available for free. Mr. Burlew's attorney represented him pro bono, and Mr. Burlew, like most Americans trapped in the legal system, could not afford to purchase the transcripts. The government can obtain all the transcripts it wants, but does not share them with defendants unless the court requires it.

114. Counsel repeatedly relayed Mr. Burlew's grievances with his conditions and asked the prosecutors if they had "any information as to why his grievances about his conditions are inaccurate," so the parties could agree on the facts before going to the Court. The prosecutors did not identify any. Instead, AUSA Krasinski wrote that the Jail said Mr. Burlew "had not gone through the proper procedure" to request a Bible.

115. On July 19, 2024, at 11:30 a.m., AUSA Krasinski sent the probation officer the government's sentencing guidelines calculation. Eighteen minutes later, counsel wrote to her that Mr. Burlew had been outside for one hour in sixty days, that the recreation he had been waiting for that day had just been cancelled, and that legal visits had been suspended. Mr. Burlew's attorney had a scheduled video call with Mr. Burlew for that afternoon, but Mr. Burlew was never brought from his cell to the call. The Jail's lawyer attributed the outage to a nationwide computer failure.

116. That evening, the Jail's lawyer, copying both prosecutors, sent a log claiming ten days of outdoor recreation for Mr. Burlew's unit in sixty days, including May 20, 22, and 23, days he spent locked in his CDF cell, and an hour at 6:30 a.m. on July 2, the only time he had actually been outside. By the Jail's own account, recreation had been cancelled because of "extreme heat, staffing, or other things such as the lawn was being mowed." Detainee logs and grievances showed outdoor recreation on just three days after June 10, and Mr. Burlew able to attend only one.

117. In late July, counsel wrote to the prosecutors in detail: the cell with two inches of toilet water, the rats and apricot-sized bugs, 90-degree heat, 23-hour lockdowns, no sky, no Bible, the same underwear for weeks, twenty pounds lost, and the lieutenant's joke. He asked, again and again, whether they had any evidence that anything Mr. Burlew said was false. AUSA Krasinski ignored the question and only responded: "Please note our objection to both the motion for release and the motion to withdraw his guilty plea." When counsel pressed, she wrote that "it's best to address these issues in filings before the Court, rather than by email."

118. On August 6, 2024, counsel asked directly whether the government had investigated whether Mr. Burlew's conditions were as he described, and whether any accommodation had been made for his disabilities. AUSA Krasinski replied: "I have reached out

to the jail but haven't yet heard back. That said, our position on both motions has not changed." The government had taken its position without knowing the facts, and would not change it however the facts came out.

119. AUSA Krasinski added that "if the jail can't provide adequate medical care (or if there is some other significant issue regarding conditions), then we would propose transfer to a different facility. But, as I mentioned, we oppose release." Counsel asked how the government intended to transfer a man whose last transfer had been part of his torture, and whether anyone had asked how to move him in a way that accommodated his disabilities. No one answered.

120. Counsel spent a month investigating Mr. Burlew's account before filing. He visited the Jail several times and met with Mr. Burlew more than once to test whether his story remained consistent. It did. It was also consistent with the accounts of dozens of other January 6 detainees, with the U.S. Marshals' report, with the D.C. Council's findings, with Rep. Marjorie Taylor Greene's reported observations, and with Judge Lamberth's contempt findings. Counsel retained a nurse consultant, Wendy Olson, and arranged two Zoom interviews of Mr. Burlew. The Jail cancelled the first without notice, later blaming "technical difficulties."

121. On July 31, 2024, Mr. Burlew moved to withdraw his guilty plea and for release under 18 U.S.C. § 3142(i), supported by his own sworn declaration and declarations from Ms. Olson and Mrs. Burlew.

122. The government's oppositions, one filed by AUSA Krasinski and one by AUSA Blackwell, did not contain a single sentence denying any of the conditions Mr. Burlew described. Instead, the government spent six pages of a fourteen-page brief rehashing its criminal allegations, as though a January 6 charge were itself proof that the man was lying. The opposition to release argued that Mr. Burlew was "a danger to the community," though the court in Tulsa had rejected

that very claim and the prosecutors had acknowledged to counsel weeks earlier that he had never been found a danger. It argued that he should stay locked up because he "failed to appear for two hearings": the November 30 and December 8 conferences he missed during the same breakdown.

123. The government faulted Mr. Burlew for supplying "records from the Department of Veterans Affairs and Social Security Administration" and declared that these were not "medical records," even though the VA is his primary health care provider and the custodian of his medical records. It set aside the findings of two federal agencies in favor of the opinion of a court-appointed psychologist who had met him once to assess competency and who knew nothing of the conditions at the Jail. It dismissed Ms. Olson's report on the ground that she had made public statements in support of January 6 defendants on social media.

124. The government's only response to the conditions was that it had sent Mr. Burlew's motion and declaration to the Office of the General Counsel of the D.C. Department of Corrections and would "be prepared to address these issues at a hearing." In other words, the Department of Justice, nearly three years after the Marshals referred the CDF to its Civil Rights Division, handed a disabled veteran's sworn account of inhumane treatment to the institution accused of it, and adopted whatever that institution chose to say. The government then told the Court that Mr. Burlew had filed no grievance about the leaking toilet, the water on the floor, the heat, the rats, the bugs, or the drug smoke, without telling the Court that the CDF had given him no grievance forms.

125. On August 9, 2024, AUSA Blackwell wrote that the Department of Corrections was "unaware of the allegations set forth in your motion and in Mr. Burlew's affidavit." She "expressly reject[ed], as untrue, any statements that the government is 'letting a disabled veteran be tortured in jail,'" and warned that silence from the prosecutors in response to counsel's emails would not mean agreement: "we are limiting our responses to these matters to our official

pleadings." The claim that the Department of Corrections was "unaware" was false. In June, Mrs. Burlew had written to the Department and the Mayor's office describing his treatment, and the Department's Deputy Director of Administration had written back that she was "currently investigating."

126. The Court set a hearing for August 15, 2024. Counsel served subpoenas on the D.C. Jail to produce for testimony four January 6 detainees who had volunteered to describe what they had seen, and a subpoena on the Jail for a representative to testify under oath about its facilities, disability assessments and ADA compliance, lockdowns, maintenance records for the leaking toilet, vermin, grievance procedures, the J6 pod, and religious accommodation. AUSA Blackwell responded that "[t]he issues about conditions at the jail are not relevant to your motions." The prosecutors contacted each detainee's attorney (at least three of the detainees were represented by court-appointed counsel) to say that counsel for Burlew had contacted their clients without the attorneys' consent. That was not true. Counsel had never contacted any of them. Each one had volunteered to Mr. Burlew to testify on his behalf to the conditions. Counsel simply subpoenaed the Jail to produce them. Nothing prevented the detainees from contacting their attorneys. In fact, one of them contacted his attorney and told him that he wanted to testify for Mr. Burlew. The government moved to quash and told counsel that the D.C. Council's 2021 emergency hearing on the Jail was "not relevant" either. In its motion, the government told the Court that none of the detainees could speak to "the conditions of his confinement prior to joining the 'J-6' pod." That was false. Joshua Atwood had been in the CDF with Mr. Burlew and had seen his cell. Counsel withdrew the subpoenas for fear that the government would retaliate against him with a bar grievance alleging an ethical violation, for what could be described at worst as a procedural mistake made in good faith. Counsel promptly contacted each detainee's attorney and wrote: “The

inmate subpoenas are hereby withdrawn. Please inform the inmates that the subpoenas are withdrawn and that if they wish to testify they are welcome to do so, but they must make their own arrangements with the jail. I do not expect them to testify and am not asking them to do so."

127. On August 14, 2024, the Court denied the motion to quash as moot and noted the government's representation that the Jail's Deputy General Counsel, Andrew Mazzuchelli, "will be available to testify at the hearing," adding that it would permit Mr. Burlew "to elicit relevant testimony from this witness." The same day, the government moved to "clarify," explaining that "Mr. Mazzuchelli is an Officer of the Court and an attorney, not a 'witness,' and thus, the government was not submitting Mr. Mazzuchelli to cross-examination by the defendant." The Court then ruled that Mr. Mazzuchelli could "respond to the Court's questions in his role as an attorney—and not as witness." The Jail's account of itself would come to the Court unsworn, and Mr. Burlew would have no chance to test it by cross-examination.

128. At the August 15 hearing, the government told the Court it would look into the matter. The hearing was continued to September 30, 2024, six weeks later. Afterward, the prosecutors sent counsel a proposed status report. It showed that the government had not investigated the Jail at all; it had simply asked the Jail and repeated what the Jail said. Even that self-serving account conceded that Mr. Burlew had been kept in his cell at least 22 hours a day for three weeks, in what the Jail called an "intake" unit, and that the toilet had leaked. On everything else, the government offered only that because Mr. Burlew had filed no formal grievance, "it is difficult to ascertain the conditions"; that "[n]o rodents or insects were reported"; and that "[t]here is not available information regarding changes of clothing or excessive heat." No one went to look. No one asked the detainees who had volunteered to testify. And the CDF had given Mr. Burlew no grievance forms with which to report anything.

129. The same report addressed the accommodations counsel had raised at the hearing. Mr. Burlew's hearing aids were "provided on the day after the hearing," three months after he entered the Jail. His requests for an adjustable cane, special shoes, ear plugs, and an adequate mattress were each turned down for lack of "clinical documentation" or "medical need," though the VA had documented his disabilities for years. Earlier, the prosecutors had told counsel that the cane, shoes, and ear plugs each required an "[a]ccess memo . . . from defense counsel." The burden of accommodating a disabled veteran was placed on his lawyer, and then the requests were refused anyway. When counsel asked the prosecutors in writing whether the Department had ever acted on the Marshals' 2021 referral, why anyone was still held in the CDF after the Marshals' findings, and whether they knew that seventeen people had died in seventeen months, he received no answer.

130. From July 2024 through January 2025, counsel asked the prosecutors and the Jail's lawyer, again and again, for any document showing that the conditions the Marshals found in 2021 had been cured. None was ever provided.

**Congress Looks, and Mr. Burlew Disappears in the Night**

131. On Monday, September 9, 2024, Representative Marjorie Taylor Greene convened a congressional roundtable on the treatment of January 6 defendants. Undersigned counsel and Mr. Burlew's wife, Brandy Bowen, testified about what had been done to Mr. Burlew in the D.C. Jail.

132. The same day, Mr. Burlew's Congressman, Representative Josh Brecheen of Oklahoma, who had participated in the roundtable, visited him at the D.C. Jail.

133. Also that day, Representative Eric Burlison of Missouri, who had taken part in the roundtable and sits on the House Oversight Committee, which has jurisdiction over the District of Columbia, went to the D.C. Jail to see for himself the conditions in which January 6 detainees were held. He was turned away at the door. He posted on X: "I just tried to visit the D.C. jail to

see the conditions J6 political prisoners are being held under, but was turned away. As a member of Congress, I have a duty to conduct oversight. This is unacceptable and I won't stop here." The post, at https://x.com/RepEricBurlison/status/1833240631763997177, has been viewed more than 1.9 million times.

134. The next day, September 10, 2024, the D.C. Department of Corrections "received a federal transfer order from the U.S. Marshal Services" naming Mr. Burlew, as the Department later told the *Tulsa World*. That evening, he was brought to the Jail's medical unit and his temperature was taken, a known sign that a detainee is about to be transferred. That night counsel emailed the prosecutors and the Jail's lawyer, copying Representative Brecheen's staff, demanding that the transfer stop, warning that it looked like retaliation and an attempt to moot the pending motions, and asking them to preserve every record of it. He filed an emergency motion.

135. In the early morning of September 11, 2024, the Marshals removed Mr. Burlew from the D.C. Jail. As with every such transfer, he was awakened in the middle of the night and moved to an unknown destination. His family and his attorney were told nothing about where he was, where he was going, or when he would arrive. His birthday had been September 8; the cards his children had sent had not yet been given to him. His children had been scheduled to visit him.

136. That afternoon, the Court denied the emergency motion as moot and denied the request for release as duplicative of the motions already set for hearing on September 26. Its minute order added: "The Court understands that Defendant has now arrived at Federal Detention Center Philadelphia." No one had told Mr. Burlew's family or his counsel. The source of the Court's information was never disclosed to the defense. Counsel learned where his client was only from that one line, and only because he had filed a motion; he could not confirm it with anyone.

137. The Department of Corrections told the press that it "does not determine when federal detainees are removed from its facilities and is not privy to their final federal destination." The Marshals, asked for comment, said a statement was being drafted. Each agency pointed at the other, and neither told Mr. Burlew's family where he was. Representative Brecheen said his office had heard the allegations of retaliation and was "actively investigating them."

138. It had happened before. In 2021, January 6 detainees were transferred out of the D.C. Jail after a congressional visit and before the Marshals' inspection. Each time Congress looked, the government did not investigate. It moved the people who had complained.

139. In August, the prosecutors had written that if the Jail had "some other significant issue regarding conditions," the government "would propose transfer to a different facility." For nearly four months, while Mr. Burlew's sworn account went undisputed, the government kept him in the D.C. Jail. It moved him out only when Members of Congress came to the door and the country was watching, fifteen days before the Court was to hear his motions. It did so without notice, in the dark of night, and without ever admitting that anything was wrong with the place it took him from.

**His Motions or the CDF**

140. On September 17, 2024, Mr. Burlew moved to appear remotely at the September 26 hearing on his motions. On September 23, after the government stated that it did not oppose the request, the Court granted the motion: "Defendant may appear remotely for the hearing set for September 26, 2024."

141. FDC Philadelphia replied that its video system used Cisco WebEx, not Zoom, that it could not accommodate a video hearing that week without a week's notice, and that it could do so on October 3. It also offered a telephone conference. The government told the Courtroom

Deputy it was "amenable to finding a new court time at which Mr. Burlew can participate via VTC from the facility."

142. The Courtroom Deputy wrote back that the court used only Zoom and that, "[s]ince the facility does not use Zoom, Mr. Burlew will have to appear in person and the hearing will be held on Thursday." When she circulated new dates, she added: "Please note as previously state[d], a virtual or telephonic hearing is not an option." The Court's own order, entered two days earlier, said otherwise. No one offered Mr. Burlew any other accommodation for his disabilities.

143. Appearing in person meant transport back to Washington and the D.C. Jail. Mr. Burlew learned he was to be put on a bus to Washington, and panicked. Counsel asked the Jail's lawyer to keep him out of the CDF. Mr. Mazzuchelli answered that "courts do not have the authority to order the transfer to one area or specific unit of the jail," and that Mr. Burlew "needs to go through intake process, which takes about 3-5 days – so regardless, he has to be a CDF intake." When counsel asked for any evidence that conditions had improved since 2021, and how the Jail would ensure that Mr. Burlew did not become the eighteenth death in eighteen months, the Jail's lawyer replied that he was "not really sure what you're even asking or contending at this point," and cited the D.C. Code. When counsel pleaded with everyone on the email to do something for the people in the CDF, the Courtroom Deputy asked him to "start a different email string that does not include me to air out you[r] complaints."

144. The Courtroom Deputy wrote to counsel: "While you have clearly been very vocal about your concerns, please note Mr. Burlew was not transported because I cancelled the transport request with the U.S. Marshal Service yesterday due to the continuation of the hearing." She warned that unless counsel moved to continue and decided whether to waive Mr. Burlew's appearance, "I will be issuing a come-up today for him to be brought here in person."

145. At the August hearing, Mr. Burlew had been told that to keep contesting his plea he would have to waive his attorney-client privilege as to his court-appointed attorney. The prosecutors contacted his court-appointed attorney and asked him to come and speak to the court on their behalf against his former client. Now he was told that to attend his hearing he would have to pass back through the CDF. On the morning of September 25, 2024, Mr. Burlew's case manager confirmed that he had been signed up for a bus to the D.C. Jail. To make sure he would not be sent back to the CDF, Mr. Burlew instructed counsel to withdraw his pending motions, vacate the hearing, and proceed to sentencing. Counsel did so that day. The Court granted the motion and vacated the hearing. Mr. Burlew never withdrew his account of what was done to him. He gave up his motions because the price of pursuing them was the CDF.

146. At 6:55 a.m. the next day, September 26, Mr. Burlew was woken and told he was scheduled to be on "bus 3" to the D.C. Jail. Counsel filed another emergency motion. The Jail's lawyer replied that if Mr. Burlew arrived, "he will be subject to the same intake procedures as every other resident in our custody." The Jail then told counsel it could not help, and that the matter was for the Marshals. Later that morning, the government reported that the Marshals were "unaware of any transports for Mr. Burlew." That was not true. Staff at FDC Philadelphia had told Mr. Burlew he was scheduled to be on the bus, and his case manager had confirmed the transport the day before. It was cancelled only after counsel raised the alarm. No one ever explained why he had twice been told he was going back.

**Punished for Speaking**

147. On September 27, 2024, two days after Mr. Burlew withdrew his motions, AUSAs Krasinski and Blackwell wrote to the probation officer, on United States Attorney Graves's letterhead, that because Mr. Burlew had moved to withdraw his plea, and because statements in

his sworn declaration were "false," he should be denied credit for acceptance of responsibility and found to have obstructed justice. Raising his offense level to 22, they calculated a range of 41 to 51 months in prison and a fine of $15,000 to $150,000.

148. Among the statements the government called false was Mr. Burlew's sworn statement that he "was completely coerced into the plea deal" by his conditions in the CDF. To rebut it, the government relied on recorded calls Mr. Burlew had made from the Jail, which it had obtained from the Department of Corrections without telling his counsel. The government used the words of a man in the CDF to prove that the CDF had not broken him.

149. Counsel asked the prosecutors three questions: Did they have any reason to believe Mr. Burlew was lying about his military service? About his disabilities? Did they have any reason to believe the Marshals' report did not reflect the CDF's current reality? AUSA Krasinski answered that she had "no reason to doubt anything specifically included in" his military records. On his disabilities, she pointed to the court-appointed psychologist's single one-hour evaluation, disregarding years of contrary findings by the VA and the Social Security Administration. On the CDF, she would not say it had been fixed. She wrote only: "You have withdrawn your motions related to the CDF."

150. In its sentencing memorandum, filed over United States Attorney Graves's name, the government asked the Court to send Mr. Burlew to prison for 51 months, and called January 6 "domestic terrorism." Its discussion of his history and characteristics ran a few short paragraphs. It did not mention his Bronze Star for valor, his Ranger Tab, his more than 500 firefights, or his broken back. Instead, in that memorandum and in its objections to the presentence report, the government combed through more than a decade of honorable service to find the single episode it could use to cast him in the worst possible light. Of the disabilities the VA had documented for

years, it wrote: "Though he certainly has some medical issues, the true extent of those issues is unclear," and "[e]ven if these injuries exist to the full extent reported by Burlew," his "medical issues should not affect his sentence."

151. Even the Probation Office did not know where he was. In late September, the probation officer proposed to interview him in the Marshals' lockup at the courthouse "[b]ecause Mr. Burlew is held at the D.C. Jail." Counsel had to explain that he was in Philadelphia, and why it mattered that he not be brought back.

**The Government Tries to Send Him Back, and the President Sets Him Free**

152. Sentencing was set for January 22, 2025. By then Mr. Burlew had been in custody for more than eight months, nearly four of them in the D.C. Jail, for missing a single court appearance during a mental health emergency.

153. An in-person sentencing meant transport back to Washington, and, as the Jail's lawyer had made clear, a CDF intake. On January 4, 2025, Mr. Burlew moved to appear remotely, attaching the Marshals' findings of civil rights violations and noting the absence of any evidence that the Department had investigated, much less fixed, the conditions.

154. On January 6, 2025, the government objected, in a filing by AUSA Krasinski over the name of United States Attorney Matthew M. Graves. The government did not dispute the Marshals' findings. It did not claim the conditions had been cured. It did not offer any alternative to the CDF, or any accommodation for Mr. Burlew's disabilities. It argued only that the Federal Rules required his physical presence.

155. Mr. Burlew replied that remote felony sentencings had been allowed during the COVID-19 emergency, and that his life would be in danger in the CDF. On January 8, 2025, he moved for an order requiring the government to show cause how it could be certain that the

conditions found in 2021 had been cured. Counsel's latest written request to the prosecutors, on January 6, 2025, asking whether any investigation had ever been conducted, went unanswered.

156. On January 11, 2025, the Court denied both motions. It moved the sentencing to the afternoon so the Marshals could bring Mr. Burlew directly from Philadelphia, and recommended the CTF if he had to be held in Washington. But it stated that it did "not suggest that the CDF currently fails to meet constitutional standards, and, indeed, no evidence regarding current conditions at the CDF has been presented to the Court." There was no such evidence before the Court because the only parties who held it, the Department of Justice and the Jail, had refused for six months to produce any.

157. On January 20, 2025, President Trump issued a proclamation granting pardons to January 6 defendants and ordering the immediate release of those in custody. That day the government moved to dismiss the case against Mr. Burlew. On January 21, 2025, the Court dismissed it with prejudice. Mr. Burlew was released from FDC Philadelphia on January 20, 2025. He was never tried, and never sentenced.

158. Every Bureau of Prisons facility in the country released January 6 detainees promptly on the President's order. The D.C. Jail did not. When counsel asked the prosecutors that night to help free the January 6 detainees still held there, AUSA Blackwell answered that "[t]he D.C. Jail cannot release without the signed order from the Court." But signed orders of dismissal were already on the docket, and the Jail still held the prisoners, many of whom had never been tried and now faced no criminal charges at all. January 6 detainees at the D.C. Jail were kept for several days after the pardons issued.

**The DOJ Acts Only When the Cameras Turn On**

159. On June 7, 2026, President Trump was asked whether January 6 defendants who pleaded guilty should be compensated. He answered that they pleaded guilty because they were told they would go to jail for 15 years if they did not, that they were frightened, that they "were destroyed by dirty cops and by weaponization," and that "[m]any of those people should be compensated." The Department of Justice has publicly described January 6 defendants as victims of "DOJ's weaponization under the Biden administration" and has committed to "make whole those who were persecuted for political purposes."

160. On June 15, 2026, an association called J6ers Were Destroyed by Weaponization, made up of January 6 defendants who were coerced into guilty pleas, petitioned this Court for a writ of mandamus directing Defendant Blanche to review and remedy those pleas. The petition described Mr. Burlew's treatment in the D.C. Jail as an example.

161. On August 28, 2026, an association called J6ers Were Tortured in the DC Gulag, made up of January 6 defendants held at the D.C. Jail, petitioned this Court for a writ of mandamus compelling the Civil Rights Division to open the investigation Judge Lamberth ordered in 2021. As of that filing, nearly five years after the referral, no such investigation had been opened.

162. On Friday, October 16, 2026, an episode of *The Tucker Carlson Show* aired featuring undersigned counsel, who described the weaponization against, among others, January 6 defendants, and described the pending lawsuits. The episode had over a million views across several social media platforms.

163. On the very next business day, Monday, October 19, 2026, then-Assistant Attorney General for Civil Rights Harmeet Dhillon, the named respondent in the petition filed by J6ers Were Tortured in the DC Gulag, wrote to Mayor Bowser giving official notice under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, that the Department was opening an investigation

into whether the District engages in a pattern or practice of violating the constitutional rights of inmates and detainees at D.C. Department of Corrections facilities by failing to protect them from excessive force, provide adequate medical care, provide safe and sanitary conditions, and provide adequate nutrition. The Department chose to examine conditions "since January 1, 2021," the week the January 6 detentions began.

164. The timing was not a coincidence. The Department had held the Marshals' referral since November 2021 and Judge Lamberth's order since October 2021, through two Administrations. It had held the *Gulag* petition since August 28, 2026. It acted on the first business day after the broadcast.

165. The Department's own letter confirms what it knew all along. The failures it now proposes to investigate are the same failures the Marshals reported to its Civil Rights Division in 2021, and the same failures Mr. Burlew swore to in 2024 without contradiction. The letter states that the Department has "not reached any conclusions."

166. On November 10, 2026, the Department moved to dismiss the *Gulag* petition, now captioned against Jesus A. Osete as head of the Civil Rights Division. It argued that the newly opened investigation moots the case; that the decision whether to investigate is entirely discretionary; that no detainee's injuries are ongoing because all were released; and that an investigation would redress nothing anyway.

167. The Department is right about one thing: a CRIPA investigation into the District's practices, opened in 2026, does nothing for Mr. Burlew. CRIPA provides him no compensation. The pardon freed him, but it did not restore the months he spent in the D.C. Jail, the health he lost there, or the trial he never had.

168. Defendants Trump, Blanche, Pirro, and the Department of Justice hold the offices that detained and prosecuted Mr. Burlew, and the individual Defendants have succeeded to the positions of their predecessors. The Department continues to defend those predecessors' conduct, to deny that the January 6 detainees have any present claim, and to withhold any acknowledgment that the D.C. Jail violated Mr. Burlew's rights. Only this Court can provide the remedy he seeks.

## CLAIMS FOR RELIEF

169. In each Count below in which it is named, the District of Columbia is liable under 42 U.S.C. § 1983 because the violations resulted from its policies and customs, and from the deliberate indifference of its final policymakers to violations of which they had actual notice: among others, the routine punitive shutoff of water, the denial of medical and mental health care, unsanitary and vermin-infested cells left unrepaired, extended lockdowns, the denial of outdoor recreation, the unavailability of grievance forms, the failure to assess or accommodate disabilities, and the upward classification of detainees because they were January 6 defendants. The District's policymakers had notice of these conditions from at least the October 2021 contempt order, the November 2021 Marshals' memorandum addressed to the Director of the Department of Corrections, and the D.C. Council's November 2021 roundtable.

170. In each Count below in which they are named, the federal Defendants are sued in their official capacities as the successors to the officials who detained, prosecuted, and held Mr. Burlew, and as the officials and agency with present authority to provide the declaratory, injunctive, and other relief requested below. The federal government is liable because the Department of Justice, the United States Attorney's Office, and the Marshals chose to hold Mr. Burlew at the D.C. Jail, with actual knowledge since 2021 that it violated detainees' civil rights, and used those conditions to obtain his plea and to defeat his efforts to withdraw it.

## COUNT I — First Amendment Retaliation (All Defendants)

171. Mr. Burlew incorporates all preceding paragraphs.

172. Mr. Burlew engaged in protected activity when he assembled and protested in Washington on January 6, 2021; when he petitioned this Court for release and to withdraw his plea, and described his treatment under oath; and when he, through his wife and counsel, brought his treatment to the attention of Members of Congress and the press on and before September 9, 2024.

173. Defendants subjected Mr. Burlew to adverse actions that would deter a person of ordinary firmness from exercising those rights: holding him in conditions they knew to be unconstitutional; classifying and segregating him as a January 6 defendant; issuing a transfer order the day after his Congressman visited and removing him without notice in the night; repeatedly scheduling him for return to the CDF while his motions were pending; accusing him of obstruction of justice because of his sworn description of his treatment, and seeking to add years to his sentence on that ground; and opposing his remote appearance so as to return him to the CDF.

174. Defendants took these actions because of Mr. Burlew's protected activity, including because they regarded January 6 protesters as a danger to "democracy" on account of their political views.

175. As a direct result, Mr. Burlew suffered physical injury, pain, emotional distress, humiliation, loss of liberty, and other damages, and was forced to abandon his motions.

## COUNT II — Fifth Amendment Due Process: Punitive Conditions, a Coerced Plea, and Coerced Abandonment of His Motions (All Defendants)

176. Mr. Burlew incorporates all preceding paragraphs.

177. As a detainee who had not been sentenced, Mr. Burlew had a right under the Due Process Clause not to be punished, and not to be held in conditions that were not reasonably related to a legitimate governmental objective or that were excessive in relation to any such objective.

178. The conditions described above (sewage, vermin, extreme heat, no clothing, deprivation of nutrition, denial of pain treatment and of medical and mental health care, extended lockdowns, denial of outdoor exercise, and denial of religious materials) were objectively unreasonable and served no legitimate purpose. Defendants knew that they posed an excessive risk to his health and safety, and acted or failed to act with deliberate indifference.

179. Due process also forbids a guilty plea induced by threats, by physical or mental coercion overbearing the defendant's will, or by misrepresentation. *Brady v. United States*, 397 U.S. 742, 750, 755 (1970). Defendants used Mr. Burlew's conditions in the CDF to overbear his will and obtain his plea. They then used the threat of return to the CDF to force him to abandon his motions to withdraw that plea and for release, and permitted the Jail to answer his sworn account without oath or cross-examination.

180. As a direct result, Mr. Burlew suffered the injuries described above, was deprived of a trial, and was deprived of a fair hearing on his motions.

**COUNT III — Sixth Amendment: Right to Counsel and to Trial (All Defendants)**

181. Mr. Burlew incorporates all preceding paragraphs.

182. The Sixth Amendment guarantees an accused the effective assistance of counsel, including the right to consult counsel and decide whether to plead guilty free of government coercion, and the right to a trial by jury.

183. Defendants interfered with those rights. They held Mr. Burlew in conditions that made meaningful consultation with counsel and rational decision-making impossible, and pressed

a plea offer on him in those conditions. The District obstructed his later counsel's access and investigation, including by cancelling his expert's interview and suspending legal visits and calls without notice. The federal Defendants refused to disclose or investigate the facts of his confinement, obtained his recorded jail calls without notice to counsel, and opposed the testimony of witnesses to his conditions.

184. As a direct result, Mr. Burlew pleaded guilty without the meaningful assistance of counsel and was deprived of his right to a jury trial.

**COUNT IV — Eighth Amendment: Cruel and Unusual Punishment (All Defendants)**

185. Mr. Burlew incorporates all preceding paragraphs.

186. At all times after his plea was accepted on May 30, 2024, and in the alternative for the entire period of his confinement, the Eighth Amendment protected Mr. Burlew from cruel and unusual punishment.

187. The conditions described above deprived Mr. Burlew of the minimal civilized measure of life's necessities, including sanitation, adequate nutrition, clothing, safe temperatures, medical and mental health care, and exercise. Defendants knew of and disregarded the excessive risk these conditions posed to his health and safety. The Jail's lieutenant mocked his weight loss; its guards told him to "quit crying" when he asked for mental health care; and it left a leak it could fix in a minute unrepaired for days.

188. As a direct result, Mr. Burlew suffered the injuries described above.

**COUNT V — Conspiracy Against Rights Under Color of Law, 42 U.S.C. § 1985(2) and (3) (All Defendants)**

189. Mr. Burlew incorporates all preceding paragraphs.

190. Beginning in 2021 and continuing through January 2025, officials of the Department of Justice, the United States Attorney's Office, the Marshals, and the D.C. Department of Corrections agreed, expressly or tacitly, to detain January 6 defendants at the D.C. Jail in conditions they knew violated their constitutional rights, to use those conditions to obtain guilty pleas, and to shield the Jail from scrutiny when detainees complained. The same conduct is made a crime by 18 U.S.C. §§ 241 and 242.

191. The conspiracy was motivated by class-based animus against January 6 defendants as a class defined by their political views and their support for President Trump, and was intended to deprive them of the equal protection of the laws and of equal privileges and immunities.

192. The conspiracy is shown by, among other things: the coordinated practice of transporting January 6 defendants to the D.C. Jail; the upward reclassification of January 6 detainees because of their status; the Department's three-year refusal to act on the Marshals' referral and Judge Lamberth's order while continuing to send detainees to the Jail; the prosecutors' practice of answering sworn complaints by asking the Jail, and taking positions before the Jail had even answered; the joint effort to keep detainee and Jail witnesses from testifying under oath, and to have the Jail's lawyer speak unsworn; the transfers of detainees after congressional visits in 2021 and September 2024; and the repeated threat of return to the CDF.

193. In furtherance of the conspiracy, the conspirators also acted to deter Mr. Burlew, as a party, and his fellow detainees, as witnesses, from attending and testifying freely in this Court, and to injure Mr. Burlew for having done so, including by accusing him of obstruction of justice for his sworn declaration, in violation of the first clause of 42 U.S.C. § 1985(2).

194. Acts in furtherance of the conspiracy injured Mr. Burlew in his person and deprived him of his rights under the First, Fifth, Sixth, and Eighth Amendments.

**COUNT VI — Disability Discrimination by the District, Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Defendant District of Columbia)**

195. Mr. Burlew incorporates all preceding paragraphs.

196. Mr. Burlew is a qualified individual with disabilities, including a fractured and improperly fused spine, rheumatoid arthritis, PTSD, severe depressive disorder, hearing loss, and heat intolerance from prior malaria, all documented by the VA and the Social Security Administration.

197. The District is a public entity, and its Department of Corrections receives federal financial assistance, including payments from the Marshals for housing federal detainees.

198. The District knew of Mr. Burlew's disabilities and failed to make reasonable accommodations. It confined him to a cot in a flooded, 90-degree cell; denied him laundry, a caseworker, and commissary because of his custody status; offered him no pain treatment but opioids until he obtained an anti-inflammatory in late August; denied him medical and mental health care; made no assessment of his disabilities; housed him on an upper floor he could not navigate in time for recreation; withheld his hearing aids for three months; first conditioned, and then refused, his cane, shoes, ear plugs, and mattress; refused his prescribed medication, his TENS unit, and the hot and cold baths he uses to manage pain; gave him forms his disability prevented him from completing and no one to help; withheld grievance forms for forty-five days, then ignored or summarily denied the written grievances in which he invoked the Americans with Disabilities Act by name; and subjected him to lockdowns and disorder that aggravated his PTSD. Its failures were intentional or deliberately indifferent to his federally protected rights.

199. As a direct result, Mr. Burlew was denied the benefits of the Jail's services, programs, and activities, including medical care, recreation, communication, and safe housing, and suffered the injuries described above.

## COUNT VII — Disability Discrimination by the Department of Justice, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) (Defendants Department of Justice, Blanche, and Pirro)

200. Mr. Burlew incorporates all preceding paragraphs.

201. Section 504 provides that no qualified individual with a disability shall, solely by reason of that disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under "any program or activity conducted by any Executive agency." The prosecution, detention, housing, and transport of federal defendants are programs and activities conducted by the Department of Justice, through the USAO and the Marshals.

202. The Department knew of Mr. Burlew's disabilities from his military, VA, and Social Security records, from the court-ordered evaluation, and from his counsel's repeated written notice. It failed to provide reasonable accommodations, and discriminated against him by reason of his disabilities, in at least these ways: it offered no remote appearance or other accommodation for the November 2023 conference, although appearance by video was how every proceeding in his case had been conducted, and its opposition to remote sentencing in January 2025 confirms that it would have refused; the Marshals transported him across the country for hours in chains without breaks, medication, or any accommodation; the Marshals chose to house him at the CDF, a facility the Department knew could not meet his needs, without assessing them; when asked how he could be transferred in a way that accommodated his disabilities, the prosecutors did not answer; in September 2024 the Marshals repeatedly scheduled him for transport back to the CDF; and in January 2025 the USAO opposed his remote appearance at sentencing and offered no alternative to the CDF.

203. As a direct result, Mr. Burlew was denied meaningful access to the proceedings in his own case, was subjected to the transport and conditions described above, and was forced to choose between his motions and his health.

204. Mr. Burlew is entitled to the declaratory and injunctive relief requested below, and to all other relief available under 29 U.S.C. § 794a.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Benjamen Burlew respectfully asks the Court to:

A. Declare that Defendants violated Mr. Burlew's rights under the First, Fifth, Sixth, and Eighth Amendments, 42 U.S.C. § 1985, Title II of the ADA, and Section 504 of the Rehabilitation Act, and that the conditions in which he was held at the D.C. Jail from May 20 to September 11, 2024 were unconstitutional;

B. Award Mr. Burlew compensatory damages against the District of Columbia in an amount to be determined at trial, and compensation against the federal Defendants to the full extent permitted by law;

C. Award Mr. Burlew punitive damages against all defendants to the full extent permitted by law;

D. Order the federal Defendants to take all steps within their authority to expunge the records of Mr. Burlew's arrest, detention, plea, and conviction in *United States v. Burlew*, No. 1:21-cr-647-RDM, which was dismissed with prejudice, and to withdraw the government's accusation that he obstructed justice;

E. Order the federal Defendants to preserve, and to produce to Mr. Burlew, all records reflecting the Department's knowledge of conditions at the D.C. Jail since January 1, 2021; its response to Judge Lamberth's referral and the Marshals' November 1, 2021 memorandum; its communications with the Jail and with the Court concerning Mr. Burlew; and its decisions concerning his detention, plea, housing, transfers, and accommodations;

F. Order the Department of Justice to adopt and follow procedures for identifying and accommodating the disabilities of federal defendants in its custody, including in transport, housing, and appearances in court;

G. Order the federal Defendants to include Mr. Burlew's treatment within the scope of the investigation announced October 19, 2026, and to report its findings to the Court;

H. Award Mr. Burlew his reasonable attorney's fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, 42 U.S.C. § 12205, and 28 U.S.C. § 2412; and

I. Grant such other relief as the Court deems just.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: November 15 , 2026

Respectfully submitted,

Jonathan Gross
LAW OFFICE OF JONATHAN GROSS
Bar ID: MD0162
2833 Smith Ave., Suite 331
Baltimore, MD 21209
(443) 813-0141
jonathansgross@gmail.com

*Counsel for Plaintiff Benjamen Burlew*